[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION Re: Post-Judgment Motions to Modify Visitation (File #'s 149, 154, 171)
This decision addresses post-judgment motions filed by both parties to modify orders regarding visitation of their two minor children. On August 19, 1998, the court, Pickett, J., entered judgment dissolving the eight-year marriage of the parties. The court adopted a written agreement of the parties providing that the parties would share joint legal custody of the two minor children, Joseph (born on November 16, 1991) and Matthew (born on July 10, 1994). The primary residence of the children would be with their mother, "subject to reasonable, liberal and flexible parenting time" by the defendant father based on a specific parenting schedule set forth in that agreement. Relevant portions of that schedule for purposes of the present motions involve the following orders:
 • The children would spend every other weekend during the school year with their father from 5:30 p.m. on Friday until Monday "morning at school time or Monday evening if Monday is a minor holiday." During summers, the alternating weekends would run from Thursday at p.m. until Sunday at 7:00 p.m.
 • The children would spend one mid-week evening from 5:30 p.m. until the following morning with their father.
 • The parties agreed to share or alternate Easter, Thanksgiving and Christmas holidays.
 • The children would spend every Fourth of July with their father.
On September 3, 1999, the plaintiff filed a "Post-judgment Motion for Modification of Visitation" (court file number 149) requesting that the CT Page 14345 defendant's mid-week visitation with his children end at 6:00 p.m. rather than last overnight and that his weekend parenting time end on Sunday evening rather than Monday morning. As the basis for her motion she stated that both parties had relocated from their marital home in New Milford, the plaintiff to Trumbull and the defendant to Ridgefield. She claimed that distance and time traveling between the parties' new homes was adversely affecting the children's health and well-being. On September 23, 1999, the defendant filed his own motion for "Modification of Visitation Post Judgment" (court file number 154) seeking three weeks of visitation in the summer and orders regarding Labor Day and Memorial Day weekends. On October 20, 2000, the defendant filed a second "Modification of Visitation Post Judgment" (court file number 171) requesting a specific order assigning responsibility for transporting the children for his parenting time.
The judicial district of Litchfield referred these motions to the regional family trial docket for trial, held over four days in April, May and July of this year. During that trial, each party testified and introduced various exhibits, and the court also heard testimony from the following other witnesses:
 • Clayton Lovallo, Jr., a family relations counselor employed by the judicial branch and who prepared a custody report completed on November 30, 2000, and an updated report completed on June 25, 2001;
 • Dr. Howard M. Krieger, Ph.D., who conducted psychological evaluations of each party and prepared a psychological evaluation dated December 1, 2001, and an update to that evaluation on February 26, 2002;
 • Attorney J. Michael Sconyers, the court-appointed guardian ad litem for the two minor children;
• James Brian Fatse, the plaintiffs husband;
• Janene Stauder, the plaintiffs mother; and
• Pamela Simoneau, the defendant's wife.
The principal issue presented in this case is whether to modify the current visitation orders. On this question, the court must be guided by the best interest of the minor children. General Statutes §46b-56 (b); Szczerkowski v. Karmelowicz,60 Conn. App. 429, 432, 759 A.2d 1050 (2000). "This involves weighing all the facts and circumstances of the family situation. Each case is CT Page 14346 unique." Gallo v. Gallo, 184 Conn. 36, 43, 440 A.2d 782 (1981). Many factors may affect such a determination. See, e.g., Ireland v. Ireland,246 Conn. 413, 452, 717 A.2d 676 (1998); Janik v. Janik, 61 Conn. App. 175,180, 763 A.2d 65 (2000). It encompasses such concerns as "the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment." Capetta v. Capetta,196 Conn. 10, 16, 490 A.2d 996 (1985). The best-interest standard is necessarily fact-specific, giving the court wide discretion to consider all the different and individualized factors that might affect a specific child's welfare and best interest.
To address the issues here the court must initially confront what the family relations counselor perceptively described as "a disturbing turn" (Def.'s ex. E at 5) in the continuing conflict involving these parents and their two children. When the plaintiff filed her initial motion to eliminate overnight stays at the defendant's house for the mid-week visitation and on Sunday, she claimed that the children were too tired after these overnight visitations, became cranky and belligerent, and as a result were having difficulty at her home and their school. She asserted that the overnight visitations and "the father's unwillingness to compromise his parenting time to transport the children to their sporting activities" (Def.'s ex. D at 2) were impairing the children's ability to engage in after-school activities. She also complained that the "father had poor anger management skills." (Id. at 3.) In his first custody evaluation, however, the family relations counselor recommended no change in the parenting orders. He found that each parent had "mutually positive" interactions with both children, who displayed "mutual affection" for whichever parent they were with at the time. (Id. at 5.) Although the older child, Joseph, told Lovallo that he disliked the midweek overnight because he had to get up too early the next day, he also said he wanted his father to come to more of his sporting events. In visits that Lovallo made to each parent's home, he found the two boys happy and comfortable in each setting, although the boys were "quieter and more reserved" in their mother's home and more "excited and engaging" at their father's home. (Id. at 5-6.)
Many of the observations by the family relations counselor in his first custody evaluation,[1] however, were also a harbinger that what might initially have appeared to be a garden-variety dispute over parenting time had many disturbing features: "inherent disharmony between the parents," "two parents that remain embroiled and perhaps at some level invested in the continuation of disagreement," disruptive patterns of communication between the parties, "destructive and unproductive energy draining transactions" between the parties, "unresolved adult-origin turmoil that has fueled their resolve to win the baffle," and "children CT Page 14347 . . . incorporated into the parental war zone as unwilling but loyal allies . . . taught much too early how to survive and accommodate the parents' need for control." (Id. at 2, 3, 7.)
In late March 2001, just before the parties were scheduled to appear for the special masters mediation in the regional family trial court, the family relations counselor's description of the children's role in the continuing conflict between their parents proved sadly prescient. The two boys began saying that they no longer wanted any contact with their father.[2] By the time of trial a year later, the parties' children were no longer taking such an extreme position but had essentially adopted the position advocated by their mother. In their proposed orders submitted by the AMC and in her closing argument, they requested no overnight visitation on Wednesdays or Sundays and limited contact with the defendant during the summers.
At trial of this case, the court received extensive evidence from both parties and various witnesses about the relationship between each party and their two children. From this evidence, several themes emerge. First, the boys have continued to voice — to the family relations counselor, to their attorney, and to their mother and maternal grandmother — complaints about visiting their father. Those complaints fall into three principal categories: they do not want to spend Wednesday or Sunday overnight at their father's house because the overnights interfere with their activities, they find it hard to transport clothing and sports equipment they need for school or after-school activities between their two homes, and they do not like their father's methods of discipline.
Yet despite the obvious fact that the children have uttered these statements to various people, their continuing behavior and relationship with their father completely belie any deterioration in that relationship. On this question, the court had the benefit of disinterested interviews with and observation of the children by the family relations counselor, guardian ad litem, and Dr. Krieger. The court here finds the reports, testimony and conclusions of all three as to that relationship to be credible, well-founded, and persuasive. Dr. Krieger concluded that "parent/child relationships appear intact" and that resolving the issues that are bothering these children "would not seem a difficult problem in most divorces" but was difficult here because of "a striking degree of animosity and an unusual refusal to attempt discussion" between the parents." (Def.'s ex. G at 3.) The family relations counselor observed spontaneous affection and "genuinely warm" interactions between father and son. The guardian ad litem testified that Matthew and Joseph told him they enjoyed their overnight visitations with CT Page 14348 their father and he concluded that they are not afraid of their father. The gist of the testimony of these three independent and objective witnesses was that, despite what the boys have said on various occasions, they have a strong, healthy, and warm relationship with their father.
What accounts, then, for these statements? Why would children who so enjoy their time with their father, as the evidence here compellingly showed, say that they do not want to see him, want to end overnight visitations and limit their summer visitation, and that he is mean to them?[3] The family relations counselor concluded that the inconsistency and "polarity in the children's behavior [with their father] to that of their articulated statements about their father" "provide some evidence that these children are not cognitively developing this concept on their own and one must believe the possibility that external influences are involved." (Def.'s ex. E at 5.) At trial he specifically referred to "external influences" as leading the boys to make these statements and stated that he believed the children were being subjected to parental manipulation, although he expressly declined to identify which parent might be the source of such manipulation. Similarly, the guardian ad litem, when asked if these children were being subjected to "parental alienation,"[4] replied that he believed there was in fact a process going on here in which the boys were being alienated from their dad.
The court finds an abundance of evidence confirming the conclusions of the GAL and family relations counselor that "external influences" are in part responsible for the boys' present position, and this court so finds. Some of their complaints about their father, for example, more reflect issues and conflict between their parents than their own interests. For example, the remark of then ten-year-old Joseph to the family relations counselor that the defendant "takes us places and buys us things to try to buy us" more probably parrots remarks he has heard adults make than own independent viewpoint. When Lovallo asked Joseph who had told him that his father had not been willing to pay for his private school tuition, Joseph identified the possible source of this information as his mother and then became extremely flustered. The plaintiffs assertions at trial that she wants her children to enjoy their time with their father were not credible. The children refer to their own father as "Ed" and, with no discouragement from the plaintiff, call Mr. Fatse "dad," the exact opposite of what one would expect. It is not necessary for the purposes of this proceeding to assess the legal effect of such "external influences," as no party has sought to modify the custody order. But a well-recognized and frequently-applied criterion for determining which parent should have primary residential custody is the respective CT Page 14349 willingness of the parents to facilitate the relationship of their children with the other parent. See, e.g., Rudolewicz v. Rudolewicz, 12 CLT No. 39, p. 664, Superior Court, judicial district of Hartford-New Britain (October 6, 1986, Arena, J.). Both parties must assess whether they, or any people in their household, are contributing toward the current problem, and how to address this problem.
The court concludes that it is not in the best interest of the minor children here to modify the parenting schedule so as to eliminate their overnight visitations with their father on Wednesdays (or some other weekday evening) and on alternating Sundays. The court instead finds that it is in the best interest of the minor children to spend more time with their father during summers and the school year.[5] The defendant shall continue to have one mid-week overnight with the children.
Yet, even with these overnights continuing, the parties must address and resolve the legitimate visitation problems arising from the overnights. The boys complain that they have difficulty transporting sports equipment and school clothing back and forth. Various activities in their mother's community in which the boys want to participate have caused scheduling conflicts with their father's parenting time. The natural tendency of children, as they get older, to participate in after-school and community youth activities often poses scheduling problems for arranging parenting time by the non-custodial "parent." "The community activities of pre-adolescence will inevitably be succeeded by the myriad of school activities and events open to middle school and high school students. All of these activities will, inexorably, cut into the time that each parent spends with the children." Tuelings v. Tuelings, docket number FA 97-0396827S, Superior Court, judicial district of New Haven (November 6, 2001). The children's own preferences will become an increasingly significant factor in assessing their best interest.
These parties will need to show a degree of flexibility to ensure that the children continue to spend significant amounts of time with their father during the school year but still have adequate opportunities to participate in their chosen activities. During the school year, they shall schedule the day of the defendant's mid-week visitation to minimize conflict with those activities. The parties should seek to honor the defendant's desire that the mid-week overnight be "sacred" family time for him with his wife and children; but the court also cautions the defendant to be flexible and plan his family rituals with a sense of what the boys want as well as what he wants.
The defendant has also requested that the court expand his summer parenting time from two to four alternating weeks during July or August. CT Page 14350 The summer visitation schedule poses particular problems for these parents. They bickered this last summer, for example, about certain conflicting activities that each parent had planned for the children. They found it difficult to cooperate on relatively simple matters such as Joseph's playing on Trumbull's Little League all-star team. The GAL testified that the current orders already chop the summer up too much, and require the boys to move back and forth from one parent's household to the other too frequently.
The court concurs that alternating weeks, either as presently in effect or as proposed by the defendant, are unduly disruptive to and not in the best interest of the children. The court also concurs with the conclusion of the GAL that having the children spend longer blocks of time with each parent would facilitate the ability of the children to participate in activities and reduce the potential for conflict. In view of the court's finding that it is in the children's best interest to spend more time with their father, the court orders that the parties shall divide their parenting time during the summer vacation period equally. During each party's summer parenting time, that parent may have two exclusive weeks; for the remainder of each party's parenting time, the other party shall have parenting time on alternating weekends from Friday at 7:00 p.m. until Monday at 9:00 a.m.
With the children's lives split between two households and two communities, new conflicts will inevitably arise so long as the parents continue their present pattern of not communicating with each other. This court can issue orders that attempt to address the boys' present complaints about visitation. The evidence establishes, however, that the issues and problems in these two families go well beyond any current estrangement between father and sons. The children themselves are being harmed by this dispute. Dr. Krieger predicted that the current conflict between these parents, if not successfully resolved, "over time will prove to be the most limiting factor in these children's psychological growth and development." (Def.'s ex. G at 4.)
The court recognizes that the plaintiff professes fear of the defendant. She has consequently chosen not to communicate directly with her ex-husband about their children. Instead, for the most part, she has preferred to communicate with Mr. Simoneau through his wife. Perhaps using third-parties would be satisfactory were the only issues here minor scheduling questions. As the issues here go much deeper, however, third-party intermediaries cannot resolve all problems. The plaintiffs previous unwillingness to meet with the defendant has made co-parenting virtually impossible. The court is heartened that the plaintiff, in her follow-up interview session with Dr. Krieger reflected in his February CT Page 14351 26, 2002, letter, said that "she was willing to meet in some way with her ex-husband for the purpose of attending to the ongoing parenting needs of her children." (Def.'s ex. J. at 2.) She expressed similar willingness in her testimony at trial. The court's orders below direct both parties to join in counseling to develop ways of working together as parents.
The remaining issues to consider are the (a) plaintiffs request to modify the orders regarding transportation of the minor children to and from the defendant's parenting time, (b) plaintiffs request to modify holiday visitation schedules, and (c) defendant's request to share school vacations during the academic year.
 • Transportation issues: It is obvious that the plaintiff has physical ailments that limit her ability to drive the children. Her husband has assumed much of that responsibility for her. She has requested an order that the defendant assume sole responsibility to transport Matthew and Joseph to and from his Wednesday parenting time and that the parties meet at Exit 42 of the Merritt Parkway in Westport for all other changes of parenting responsibility. The court orders no change in the transportation responsibilities. The court concurs with the GAL that each party transporting the children from its home to the other parent's home for that parent's parenting time will reduce the friction points and cut down on the interactions that have so vexed these parties.
 • Holidays: The plaintiff correctly points out that the original court orders of alternating weekends had the effect of preventing her from ever sharing Fourth of July, Memorial Day, or Labor Day weekends with the children. The court's orders will address this anomaly. It is in the children's best interest to be able to spend extended holiday weekends and term-time vacations with both parents.
 • Term-Time Vacations: Parenting time during all extended school vacations during the academic years shall be shared equally or alternated.
 ORDERS
The court has carefully considered all of the evidence, including the exhibits and the testimony presented, according to the standards required by law. Upon such consideration, the court enters the following orders as in the best interest of the minor children:
1. Parenting time:
CT Page 14352
a) School-year parenting time:
i) The defendant will have parenting time with Matthew and Joseph during the school year on one mid-week day from after school until the beginning of school the next day. That mid-week visitation shall be on Wednesdays unless the parties agree otherwise.
ii) The defendant will have parenting time every other weekend from after school on Friday until the beginning of school for the following week.
iii) Before the beginning of each school semester, the parties shall confer on sports, recreational and other activities in which the children may wish to participate. During the school year, they shall schedule the day of the defendant's midweek visitation to minimize conflict with those activities.[6]
 b) Summers:
i) The parties shall have equal amounts of parenting time during the summer vacation of the minor children, and they shall take such parenting time in continuous blocks of time. In odd-numbered years, plaintiffs summer parenting time shall be the first half of the summer, and defendant's the last half in even-numbered years, defendant's parenting time shall be in the first half of the summer and plaintiffs in the last half. During each summer, each party shall have two weeks of exclusive parenting time. During weeks of non-exclusive parenting time, the other party shall have visitation with the minor children on alternating weekends from Friday at 5:00 p.m. to Monday at 9:00 a.m. Parenting time for the Fourth of July shall be governed by the provisions of this paragraph.
ii) Before each summer, the parties shall confer and attempt to agree as to whether it would be in the children's best interest for them to continue participating in organized, ongoing activities which the children began while living with the plaintiff during the school year. Absent such agreement, the party with parenting time for a particular week shall have final decision-making authority as to the children's activities while with that parent.
c) Holidays:
i) The parties shall alternate all extended holiday weekends during the school year, except that the provisions of this paragraph shall not alter the provisions of the original agreement adopted by the court as to CT Page 14353 Easter, Thanksgiving, or Christmas.
ii) When special holiday provisions in either this decision or the original agreement cause conflict with a party's regularly scheduled parenting time as set forth herein, then that regular parenting time will be delayed until the next weekend.
iii) Academic year vacation periods: Parenting time during all extended school vacations during the academic year shall be shared equally or alternated, except that the provisions of this paragraph shall not alter the provisions of the original agreement adopted by the court as to Thanksgiving, or Christmas.
d) Transportation for parenting time: The party which has parenting time shall transport the children to the other party for that other party's parenting time.
2. Counseling for the parties and minor children pursuant to GeneralStatutes § 46b-56 (g)
 a) Counseling for the minor children: The parties shall ensure that both children begin regular therapy with a therapist. The purpose of such counseling is to explore the children's feelings and affections for each parent and to develop healthy relationships with each parent. Each party shall participate in such therapy as often as, and to the extent, requested by the therapist. Any expenses for such therapy not paid for by health insurance shall be split equally by the parties (in accord with paragraphs 4.4 and 4.5 of the separation agreement). The parties shall each pay for their own participation in any therapy requested by the therapist.
b) Counseling for the parties: The plaintiff and defendant shall immediately enter counseling together to develop better communications and co-parenting skills and abilities. Such counseling shall commence within sixty days of the date of this decision. They will meet jointly with each other and the counselor at least every six weeks, or more frequently if recommended by the counselor, to share and discuss information each parent needs to know in order to make informed parenting decisions. The parties shall split the cost of such counseling.
c) If the parties have not agreed on the names of the therapist and/or counselor to conduct the therapy and counseling specified in the two paragraphs above within thirty days, they shall each submit to the AMC the names of three counselors they propose for each task (counseling for the children, counseling for the parties) within the same thirty CT Page 14354 days. If an agreement on either is reached within 45 days from the date of this decision, a stipulation shall be submitted to the Regional Family Trial Docket with the selected counselor or therapist. If an agreement is not reached through the AMC, then the AMC shall notify the court within the same 45 days and the court shall decide.
d) The court retains jurisdiction over the terms of this paragraph.
3. This court retains jurisdiction for the entry of orders regarding fees for the children's attorney and the guardian ad litem upon presentation of their affidavits of fees.
SO ORDERED.
BY THE COURT,
 ___________________ STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT